1

2

3

4

5

6

7

8             **IN THE UNITED STATES DISTRICT COURT**

9           **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   ROBERT E. LEE,                   No.  2:24-CV-1876-DAD-DMC-P

12           Petitioner,

13                               <u>FINDINGS AND RECOMMENDATIONS</u>
           v.

14   JAME HILL,

15           Respondent.

16

17         Petitioner, a prisoner proceeding pro se, brings this petition for a writ of habeas

18 corpus under 28 U.S.C. § 2254.  Pending before the Court is Petitioner's petition for a writ of

19 habeas corpus, ECF No. 1, Respondent's answer, ECF No. 12, and Petitioner's traverse, ECF No.

20 14. Respondent has lodged the state court record, ECF No. 10.

21         Because this action was filed after April 26, 1996, the provisions of the

22 Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable.

23 <u>See</u> <u>Lindh v. Murphy</u>, 521 U.S. 320, 336 (1997); <u>Calderon v. United States Dist. Ct.</u> <u>(Beeler)</u>, 128

24 F.3d 1283, 1287 (9th Cir. 1997), <u>cert.</u> <u>denied,</u> 522 U.S. 1099 (1998).  Under AEDPA, federal

25 habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in

26 / / /

27 / / /

28 / / /

state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law. Under both standards, "clearly established law" means those holdings of the United States Supreme Court as of the time of the relevant state court decision. See Carey v. Musladin, 549 U.S. 70, 74 (2006) (citing Williams, 529 U.S. at 412). "What matters are the holdings of the Supreme Court, not the holdings of lower federal courts." Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en banc). For federal law to be clearly established, the Supreme Court must provide a "categorical answer" to the question before the state court. See id.; see also Carey, 549 U.S. at 76-77 (holding that a state court's decision that a defendant was not prejudiced by spectators' conduct at trial was not contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice created by state conduct at trial because the Court had never applied the test to spectators' conduct). Circuit court precedent may not be used to fill open questions in the Supreme Court's holdings. See Carey, 549 U.S. at 74.

In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the Court), the United States Supreme Court explained these different standards. A state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme Court on the same question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. See id. at 405. A state court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases. See id. In sum, the petitioner must demonstrate that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules. Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard. See id. at

2

1  406. If a state court decision is "contrary to" clearly established law, it is reviewed to determine

2  first whether it resulted in constitutional error. See Benn v. Lambert, 283 F.3d 1040, 1052 n.6

3  (9th Cir. 2002). If so, the next question is whether such error was structural, in which case federal

4  habeas relief is warranted. See id. If the error was not structural, the final question is whether the

5  error had a substantial and injurious effect on the verdict or was harmless. See id.

6          State court decisions are reviewed under the far more deferential "unreasonable

7  application of" standard where it identifies the correct legal rule from Supreme Court cases, but

8  unreasonably applies the rule to the facts of a particular case. See Wiggins v. Smith, 539 U.S.

9  510, 520 (2003). While declining to rule on the issue, the Supreme Court in Williams, suggested

10  that federal habeas relief may be available under this standard where the state court either

11  unreasonably extends a legal principle to a new context where it should not apply, or

12  unreasonably refuses to extend that principle to a new context where it should apply. See

13  Williams, 529 U.S. at 408-09. The Supreme Court has, however, made it clear that a state court

14  decision is not an "unreasonable application of" controlling law simply because it is an erroneous

15  or incorrect application of federal law. See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63,

16  75-76 (2003). An "unreasonable application of" controlling law cannot necessarily be found even

17  where the federal habeas court concludes that the state court decision is clearly erroneous. See

18  Lockyer, 538 U.S. at 75-76. This is because "[t]he gloss of clear error fails to give proper

19  deference to state courts by conflating error (even clear error) with unreasonableness." Id. at 75.

20  As with state court decisions which are "contrary to" established federal law, where a state court

21  decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless

22  unavailable if the error was non-structural and harmless. See Benn, 283 F.3d at 1052 n.6.

23          The "unreasonable application of" standard also applies where the state court

24  denies a claim without providing any reasoning whatsoever. See Himes v. Thompson, 336 F.3d

25  848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). Such decisions

26  are considered adjudications on the merits and are, therefore, entitled to deference under the

27  AEDPA. See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 223 F.3d at 982.

28  The federal habeas court assumes that state court applied the correct law and analyzes whether the

3

1   state court's summary denial was based on an objectively unreasonable application of that law.

2   See Himes, 336 F.3d at 853; Delgado, 223 F.3d at 982.

3

4                              **I.  BACKGROUND**

5          A.    **Facts**[1]

6                 The following facts are recited by the California Court of Appeal in its opinion on

7   direct review affirming Petitioner's conviction and sentence, and Petitioner has not presented any

8   evidence to rebut the presumption that these facts are correct. The Court of Appeal outlined the

9   facts of the case as follows:

10                Defendant was married to Bonnie. They had been together since
             they were teenagers, some 60 years before the events described herein.
11           Bonnie suffered from various health problems, including problems with
             one of her feet. Bonnie was treated for an ingrown toenail by Dr. Thomas
12           Shock, a podiatrist. The toenail became infected and gangrenous, and Dr.
             Shock eventually amputated Bonnie's toes and half of her foot. Bonnie's
13           health and quality of life declined precipitously, and she passed away in
             2016 at the age of 78.
14                Defendant blamed Dr. Shock for Bonnie's death. He told his
             daughter, Cheri, he wanted Shock dead. At first, defendant told Cheri he
15           intended to kill Shock and take his own life. Later, he told Cheri he met a
             man at a gas station who was going to help him kill Shock. Cheri thought
16           defendant was just blowing off steam.

17                *A. The Shooting of Dr. Shock*

18                Dr. Shock lived in Lodi with his wife of many years, Nancy. On
             the night of August 1, 2018, Nancy went upstairs to bed sometime
19           between 9:00 and 9:30 p.m. Shock stayed downstairs.
                  A neighbor was walking across the street from the Shocks' house
20           that night around 9:45 p.m. The neighbor heard a gunshot and saw a man
             running toward a car parked in front of the Shocks' house. Another
21           neighbor was driving by the house around the same time. That neighbor
             heard two gunshots and saw a light-colored SUV idling in front of the
22           house. Both neighbors saw someone drive away quickly.
                  Police officers from the Lodi Police Department responded shortly
23           thereafter. They found Dr. Shock lying across the threshold of the house.
             Shock had been shot in the chest, arm, and head and was unresponsive. An
24           autopsy and ballistics analysis would later reveal that he had been shot

25   _____
         [1]     Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made
26   by a State court shall be presumed to be correct."  Findings of fact in the last reasoned state court
     decision are entitled to a presumption of correctness, rebuttable only by clear and convincing
27   evidence.  See Runningeagle v. Ryan, 686 F.3d 759 n.1 (9th Cir. 2012).  Petitioner bears the
     burden of rebutting this presumption by clear and convincing evidence.  See id.  These facts are,
28   therefore, drawn from the state court's opinion(s), lodged in this court.  Petitioner may also be
     referred to as "defendant."

three times at close range with bullets consistent with a .38 special or a .357 magnum revolver. Shock was declared dead at the scene.

### B. Investigation

Officers secured the scene and detectives began their investigation. Surveillance videos from neighbors showed a single vehicle—an SUV—driving down the street around the time of the shooting. The SUV was registered to codefendant Raymond Jacquett.

A piece of paper was found near the body. Detective Michael Hitchcock, the lead investigator, determined the paper was a page from a complaint against Dr. Shock to the Medical Board of California by Bonnie. The page was analyzed for fingerprints and found to contain the prints of codefendants Mallory Stewart and Christopher Costello.

A search warrant was executed on Costello's cell phone (footnote omitted) An examination of the phone revealed that Costello called defendant the day before the shooting.

A search warrant was executed on defendant's house. Police found a copy of Bonnie's complaint against Dr. Shock. The complaint was missing a single page—the one found at the crime scene. Police also found a handwritten note from defendant to his children, stating, in part: "Maybe I will find out why God took mom so soon and let her suffer so. I believe in an eye-for-an-eye . . . . I hope Shock spends his time in [hell] . . . and I get to see him face-to-face."

Police searched defendant's computer. They found several searches relating to Dr. Shock, including a search for his home address. They also found searches relating to guns and silencers. Defendant's bank records showed he made a series of withdrawals totaling $5,600 in the days before the shooting. They also reflected a charge at a diner in Sacramento on the day of the shooting.

A search of the California Department of Justice's automated firearm system database revealed that defendant owned three revolvers, all .38 caliber. No such weapon was found in defendant's house. However, police found a .32-caliber semiautomatic pistol. Police also found three boxes of .38 special ammunition, with 10 rounds missing from one of the boxes.

Police recovered several cell phones from defendant's house and car. As we shall discuss, call detail records showed defendant communicated with Costello and Stewart in the days leading up to the shooting. Cell site locational data likewise showed that members of the group were in the same places at the same times on the day of the shooting. Defendant and the others were arrested and taken into custody.

### C. Charges and Dispositions of Codefendants' Cases

The four men—defendant, Costello, Stewart, and Jacquett—were charged by consolidated information with murder with special circumstances of murder for financial gain and lying in wait (§§ 187, subd. (a), 190.2, subd. (a)(1) and (15)) (footnote omitted). Defendant pled not guilty and denied the allegations.

Jacquett and Costello were each tried separately. (See *People v. Jacquett* (July 14, 2022, C091059) [nonpub. opn.]; *People v. Costello* (May 9, 2023, C095289) [nonpub.opn.].) Jacquett was convicted of second degree murder and sentenced to 15 years to life in state prison. (*People v. Jacquett, supra,* C091059.)**4** Costello was convicted of first degree murder

5

1    for financial gain and sentenced to life in prison without the possibility of
     parole. (*People v. Costello, supra,* C095289.)

2         Stewart entered a negotiated plea in which he agreed to plead
     guilty to first degree murder and receive a sentence of 50 years to life in

3    state prison in exchange for his testimony against defendant.

4              *D. Jury Trial*

5         Defendant's case was tried to a jury over the course of several
     weeks in March 2022. The prosecution's witnesses, including Detective

6    Hitchcock, testified substantially as described *ante* (footnote omitted). The
     prosecution also presented other evidence that will be relevant here, which

7    we will attempt to summarize as briefly as possible.

8              *1. The Prosecution's Case*

9         As previously discussed, Cheri testified to conversations in which
     defendant, her father, expressed an intent to kill Dr. Shock. She also

10   testified to conversations after the shooting. According to Cheri, defendant
     said three men came to his house on the night of August 1, 2018. Some of

11   them, including defendant, drove to Shock's house. Defendant told Cheri
     he waited in the car and watched as one of the men walked to the door and

12   shot Shock with defendant's .38 caliber revolver. Defendant said he paid
     the men $5,000. He asked Cheri to testify that he had given her $3,000.

13        Cheri was interviewed several times by Detective Hitchcock and
     Eduardo Rodriguez, an investigator with the San Joaquin County District

14   Attorney's Office. She initially went along with defendant's version of
     events. She told Hitchcock and Rodriguez she received $3,000 or $3,500

15   from defendant and insisted he never said anything about hurting Dr.
     Shock. However, she later called Rodriguez and told him defendant had

16   admitted to playing a role in the shooting.

17        Cross-examination focused on possible reasons for Cheri's change
     in tune. Cheri admitted lying to Detective Hitchcock when she said
     defendant had given her $3,000. She also admitted lying when she said he

18   never mentioned hurting Dr. Shock. Cheri acknowledged that she had an
     interest in defendant's financial affairs and his mounting legal fees were a

19   source of concern to her. At some point, Cheri learned one of defendant's
     attorneys had placed a lien on defendant's house. Cheri was disappointed,

20   as she had always understood she and her brother stood to acquire an
     interest in the house. She urged her father to fire his attorney and retain

21   someone less expensive. Defendant refused. Cheri called Detective
     Rodriguez less than two weeks later. Rodriguez, who testified for both the

22   prosecution and defense, would later testify that Cheri was upset about the
     house when she told him about defendant's alleged admission.

23        Stewart testified pursuant to the aforementioned plea agreement.
     Stewart said he met defendant through Costello on the day of the shooting.

24   They had lunch at a diner in Sacramento. Afterwards, they went to a
     nearby bank, where defendant withdrew money to give Costello. A plan

25   was made to meet later at defendant's house in Lodi.

         Stewart and Costello were eventually joined by Jacquett. The three

26   men drove to defendant's house. Stewart and Costello went inside and
     spoke with defendant. Defendant showed them a photograph of Dr. Shock

27   on the Internet. He told them he wanted Shock dead for having botched
     surgery on his wife. He showed them two guns. and suggested they use a

28   pizza box as an excuse to approach Shock's door. In the end, they decided

                                    6

to approach Shock's door with a clipboard and piece of paper.

Defendant, Stewart, and Jacquett drove to Dr. Shock's house (footnote omitted). They parked in front. Stewart got out of the car and went to the door holding the clipboard and one of defendant's guns. Shock answered the door in his underwear. Stewart shot him and returned to the car. The group drove back to defendant's house. Defendant gave Stewart $3,000 and the gun. At some point, Stewart realized he no longer had the piece of paper from the clipboard.

Sara Morin, a crime analyst with the California Department of Justice, testified as an expert in the field of cell site analysis. Morin explained that she analyzed call detail records and cell phone extractions for phones associated with defendant, Stewart, Costello, and Jacquett. [7]

> [7] Morin testified that she received the call detail records and cell phone extractions from Detective Hitchcock. However, Hitchcock would have received the call detail records from cell phone carriers. This will become important later.

The records showed cell phones associated with defendant and Costello connected with a cell tower near a store in Lodi on July 27, 2018. That connection was followed by a flurry of calls between the relevant phones over the next several days including two calls between phones associated with defendant, Costello, and Stewart, lasting more than 40 minutes altogether. On July 31, 2018, the day before the shooting, Stewart's phone sent defendant's phone a text message, stating: "Hey, im waitn for yall so I can get that job done for you." [8]

> [8] Defendant denied speaking to Stewart or receiving texts from him.

Cell site analysis of the relevant phones placed defendant and the other men in the same locations at the same times on the day of the murder. Phones associated with defendant and Costello were both near Stewart's house in Sacramento around 1:00 p.m. on August 1, 2018. There was no call activity between the phones from 1:00 p.m. to 2:00 p.m., but all three phones connected to cell towers near Stewart's house and the bank. At 2:23 p.m., defendant's phone connected with a cell tower near the diner in Sacramento.

Around 5:00 p.m., defendant's phone connected to a cell tower near his home in Lodi. Jacquett and Costello's phones connected to cell towers in Lodi shortly thereafter (footnote omitted). Costello's phone attempted to connect with defendant's phone, Jacquett's phone, and Stewart's phone in the 15 minutes preceding the shooting, but the calls went to voicemail or failed to connect. There was a break in cell phone activity around the time of the shooting.

Cell phone activity resumed within 20 minutes of the shooting, with a succession of three short calls between defendant's phone and phones associated with Costello. Cell phone activity between phones associated with defendant and Costello continued the next day. According to Morin, defendant's phone called Costello's phone at 11:07 a.m., and connected for less than two minutes. Costello's phone called defendant's phone at 3:51 p.m. that afternoon and connected for nearly five minutes. That call appears to have been the last contact between defendant's phone and of those of any of his codefendants.

7

All in all, Morin testified there were "less than 20 contacts" between defendant's phone and phones associated with Costello, and "about [10] contacts" between defendant's phone and phones associated with Stewart (footnote omitted). Significantly, all such contacts took place during the four-day period between July 30 and August 2, 2018. Morin also noted that the day of the shooting (August 1, 2018) was the only time defendant's phone connected with a cell tower in Sacramento or Jacquett's phone connected with a cell tower in Lodi.

On cross-examination, Morin explained that she received the names of suspected users of the relevant phones from Detective Hitchcock. Morin acknowledged she has no way of knowing the names of the suspected users are correct. She also acknowledged she has no way of knowing what might have been said during conversations between users.

*2. Defense Case*

Defendant testified in his own defense and denied any involvement in Dr. Shock's murder. Defendant acknowledged meeting Costello at the store in Lodi on July 31, 2018. However, he testified that Costello offered to sell him pain pills. Defendant said he bought the pills and exchanged phone numbers with Costello. He then drove Costello to Stockton. As they drove, defendant told Costello about what had happened to Bonnie.

According to defendant, Costello called the next day to offer more pills for sale. Defendant drove Costello to Sacramento, where they were joined by Stewart. The group went to a diner, where they had lunch and discussed pills defendant might buy. They went to the bank and agreed to meet at defendant's house in Lodi to complete another transaction for pills. Somewhere along the line, on July 30 or July 31, 2018, defendant withdrew $5,000 from the bank. He said he gave $3,500 to Cheri and kept the balance for himself.

Defendant confirmed that Costello and Stewart came to his house on August 1, 2018, as agreed. They were driven by Jacquett, who waited in the car while the others discussed the drug deal. According to defendant, Costello and Stewart noticed photographs of Bonnie and asked about her. Around the same time, Costello told defendant they intended to rob him. Costello took pills, money, and two guns from defendant's bedroom. He also took a single page from Bonnie's complaint against Dr. Shock. According to defendant, Costello handed the page to Stewart and told him to "go do what I told you." Costello and Jacquett left defendant's house, leaving Stewart behind. Eventually, Jacquett came back and collected Stewart.

The next day, Costello called and demanded $4,000. When defendant asked what for, Costello responded, "we did you a favor." That, defendant said, was the last he heard from any of his codefendants.

Defendant testified he gave Cheri power of attorney following his arrest. But father and daughter argued about legal expenses. According to defendant, Cheri became upset upon learning that he had given a prior attorney an attorney's lien. What's more, defendant said, his son told him that Cheri and her boyfriend were spending all his money. Defendant eventually revoked Cheri's power of attorney and granted that authority to his son. Defendant denied telling defendant he planned to kill Dr. Shock.

On cross-examination, defendant acknowledged speaking with Detective Hitchcock for several hours on September 20, 2018, but saying nothing about pills or a robbery. He admitted driving by Dr. Shock's house and searching the Internet for information about Shock and guns.

1
2

He allowed that he might have told Hitchcock he had no revolvers or, if he were going to buy a gun, it would be an automatic. He also said he regularly researches guns and other things on the Internet to pass the time.

3

ECF No. 10-31, pgs. 2-10.

4

**B.**    **Procedural History**

5
6

The Court of Appeal recited the following procedural history related to Petitioner's conviction and sentencing:

7
8
9

The jury found defendant guilty of first-degree murder after approximately two hours of deliberation. (§ 187, subd. (a).) The jury found true the special circumstance allegation that the murder was committed for financial gain. (§ 190.2, subd. (a)(1).) The trial court sentenced defendant to life in state prison without the possibility of parole.

10
11

ECF No. 10-31, pg. 10 (unspecified statutory citations are to the California Penal Code).

12
13
14
15
16

The California Court of Appeal affirmed Petitioner's conviction and sentence on March 21,2024, in People v. Lee, case no. C098085 (unpublished).  See ECF No. 10-31.  The California Supreme Court denied direct review on May 29, 2024, without comment or citation.  See ECF No. 10-33.  Petitioner did not file any state court post-conviction actions.  The instant federal petition was filed on July 8, 2024.  See ECF No. 1.

17
18

**II.  DISCUSSION**

19
20
21
22
23
24
25

In the habeas petition, Petitioner argues the government committed a violation of Brady v. Maryland, 373 U.S. 83 (1963), thus denying Petitioner due process, because the government belatedly disclosed that Detective Hitchcock, who conducted the investigation and served as a Prosecution witness, was previously disciplined for mishandling evidence.  See ECF No. 1, pg. 11.  Additionally, Petitioner argues that his due process rights were violated when the lower courts denied Petitioner's motions for dismissal and a new trial, both of which were based on this allegation of a Brady violation. Id.

26

/ / /

27

/ / /

28

/ / /

9

1    In the answer, Respondent argues that Petitioner is not entitled to federal habeas

2   relief on his claim.  See ECF No. 12.  Specifically, Respondent contends that the delayed

3   disclosure does not constitute a Brady violation because it was disclosed, even if mid-trial. See id.

4   at 19-20. Respondent asserts that the evidence was not material, as required for finding a Brady

5   violation, because there was no evidence Detective Hitchcock "affected the accuracy of the data

6   retrieved from the cell phones." Id. at 20-21. Further, Petitioner admitted to being in the

7   geographic locations with his accused co-conspirators, as the cell site data indicated. See id.

8    For the reasons discussed below, the Court finds that federal habeas relief is not

9   warranted.  First, there is no clearly established Supreme Court precedent establishing that

10   delayed disclosure of potentially exculpatory evidence amounts to suppression of such evidence

11   in violation of the Constitution.  Second, even if there was an impermissible suppression of

12   evidence, the evidence at issue was not material.

13    **A.    Suppression**

14    Petitioner claims that Prosecution knew that Detective Hitchcock, the lead

15   detective in the investigation, was accused of mishandling evidence during other investigations

16   and that was not disclosed to Petitioner until midtrial, after the government had rested their case.

17   See ECF No. 1, pg. 11. This disclosure only came about because Petitioner heard rumors about

18   Detective Hitchcock's internal affairs investigation during the trial. See id. After Petitioner's

19   arrest, Detective Hitchcock was arrested for driving under the influence and resigned from his

20   position a few months later. See id. While Petitioner admits that his counsel knew about the

21   driving under the influence charge and Detective Hitchcock's subsequent resignation, Petitioner

22   argues that his counsel "did not realize its significance" because they did not know about

23   Detective Hitchcock's "history of misconduct." Id.

24    In rejecting this claim, the California Court of Appeal began its discussion with a

25   with a summary of Brady obligations and the three elements required to prove a Brady violation.

26   See ECF No. 10-31, pgs. 13-15. Because the People conceded one Brady element, that the

27   information was favorable to the defendant, the Court focused its' analysis on the two other

28   elements: whether information was withheld and whether the information was material. To

10

1    determine if the evidence was withheld, the Court applied the California Supreme Court and

2    Circuit Court standard that "evidence that is belatedly disclosed during trial may be considered

3    suppressed or withheld within the meaning of Brady if the delay causes prejudice." ECF No. 10-

4    32, pg. 32 (citing People v. Mora and Rangel (2018) 5 Cal.5th 442, 467-468; and United States v.

5    Burke (10th Cir. 2009) 571 F.3d 1048, 1055-1056.). Respondent argues that "the Supreme Court

6    has not clearly established that the prosecution's disclosure must occur prior to trial." ECF No.

7    12, pg. 19. According to Respondent, that means that the evidence here was not suppressed, a

8    required element for finding a Brady violation.

9           Due process rights are violated when the prosecution suppresses evidence

10   "favorable to an accused . . . where the evidence is material either to guilt or to punishment,

11   irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87

12   (1963). The duty to disclose such evidence applies even when there has been no request by the

13   accused, United States v. Agurs, 427 U.S. 97, 110 (1976), and encompasses impeachment

14   evidence as well as exculpatory evidence, United States v. Bagley, 473 U.S. 667, 676 (1985).

15          Evidence is material for Brady purposes if it "is sufficient to 'undermine

16   confidence' in the verdict."  Wearry v. Cain, 577 U.S. 385, 392 (2016) (quoting United States v.

17   Bagley, 473 U.S. 667, 678 (1985)). In sum, for a Brady claim to succeed on collateral review,

18   petitioner must show: (1) that the evidence at issue is favorable to the accused, either because it is

19   exculpatory or impeaching; (2) that it was suppressed by the prosecution, either willfully or

20   inadvertently; and (3) that it was material (or, put differently, that prejudice ensued). Banks v.

21   Dretke, 540 U.S. 668, 691 (2004); Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

22          There is no Supreme Court precedent establishing that delayed disclosure can

23   constitute suppression for Brady purposes. The Supreme Court has never clarified or required an

24   exact time for the disclosure of exculpatory evidence. In the foundational case, Brady v.

25   Maryland, the evidence at issue was disclosed to the defendant only after trial, conviction,

26   sentencing, and his conviction was reaffirmed. Brady v. Maryland, 373 U.S. 83, 84 (1963). Here,

27   the evidence was disclosed mid-trial, after the prosecution rested its' case. See ECF No. 1, pg. 9.

28   Therefore, the issue at hand is a delayed disclosure, not suppression. Given that there is no clearly

1    established federal law equating delayed disclosure and suppression for <u>Brady</u> purposes, there

2    was no suppression here. Thus, this Court cannot find that California Court of Appeal's

3    application of <u>Brady</u> requirements was contrary to or an unreasonable application of established

4    federal law.  <u>See</u> § 2254(d)(1); <u>see also</u> <u>Carey</u>, 549 U.S. at 76-77.

5        **B.**    <u>**Materiality**</u>

6            Even if this Court were to find the delayed disclosure here amounts to suppression,

7    the Court of Appeal's analysis and finding that the evidence was not material is consistent with

8    clearly established law and a reasonable application of such law. Finding a <u>Brady</u> violation

9    requires showing the evidence was material to, or prejudiced, the proceedings.  <u>Banks v. Dretke</u>,

10   540 U.S. 668, 698-99 (2004). Materiality requires a showing that "the new evidence is sufficient

11   to 'undermine confidence' in the verdict."  <u>Wearry v. Cain</u>, 577 U.S. 385, 392 (2016) (quoting

12   <u>United States v. Bagley</u>, 473 U.S. 667, 678 (1985)).

13           Petitioner asserted that if the information about Detective Hitchcock's past

14   discipline for mishandling of evidence had been disclosed earlier, he would have prepared for

15   trial differently and hired his own expert to challenge the cell phone evidence. <u>See</u> ECF No. 1, pg.

16   9. Respondent contends that there was no prejudice because "Petitioner's defense did not hinge

17   on the accuracy of the cell phone data placing actors in certain locations and recording

18   communication between them; that was conceded." <u>See</u> ECF No. 12, pg. 20-21.

19           The Court of Appeal determined that Petitioner failed to establish prejudice

20   because Petitioner could not show how the information, if disclosed earlier, could have been used

21   differently. <u>See</u> ECF No. 10-32, pg. 32. The Court concluded this because "Detective Hitchcock

22   only played a limited role in handling the cell phone evidence . . . [and] there was no evidence he

23   [mishandled the evidence] here." <u>Id.</u> at 17. Further, "there was no evidence that Detective

24   Hitchcock was meaningfully involved in processing or preparing" the information extracted from

25   the cell phones and "defendant's own testimony confirms the essential accuracy" of the cell

26   / / /

27   / / /

28   / / /

1    phone data used in trial. Id. at 17-18. Thus, the Court of Appeal held that there was:

2            no reasonable probability the outcome of the trial would have been
3            different had the information from Detective Hitchcock's personnel
             records been disclosed sooner. Even assuming that Hitchcock had
             mishandled cell phone evidence in some way, and an expert had been
4            retained to so testify, the jury would have still had to decide between the
             prosecution's murder-for-hire theory and the defense theory that Costello
5            ordered Stewart to murder Dr. Shock as some sort of favor to defendant.
             The jury would still have to weigh Cheri and Stewart's credibility against
6            defendant's and decide whether the purpose of the phone calls and
             meetings was to arrange a murder or buy pills. Defendant has given us no
7            reason to believe defense counsel would have prepared for trial
             differently, or the jury would have made another choice, had the
8            information from Hitchcock's personnel records been disclosed sooner.

9            Id. at 35.

10           This Court agrees. Petitioner presents an alternative narrative that explains, rather

11   than challenges, the cell phone evidence. As such, the accuracy of the cell phone evidence is not

12   at issue. What Petitioner presents amounts to a factual dispute between Petitioner's explanation

13   for the underlying cell phone evidence and the Prosecution witness' explanation. Indeed, it seems

14   Petitioner was able to provide this narrative, or at least portions of this narrative, to the jury and

15   the jury made a credibility determination when deciding what version to believe. See id. at 25-26.

16   To the extent that Petitioner did not provide these facts to the jury, that decision is not impacted

17   by the accuracy of the underlying data because, again, Petitioner's narrative does not challenge

18   the accuracy of the data.

19           Petitioner provides three examples to argue that the cell data was inaccurate, as

20   follows: (1) Petitioner met Costello after July 31, 2018 despite their phones pinging the same

21   tower on July 27, 2018; (2) Petitioner does not know how to text so could not have received the

22   text message from Costello, and (3) Petitioner only spoke with Costello for at most five minutes

23   on the phone. See ECF No. 1, pgs. 7-9. These examples do not challenge the accuracy of the cell

24   phone evidence. As Petitioner himself says, the evidence that Petitioner's phone and Costello's

25   phone connected with the same tower on July 27, 2018, could be because of the proximity of

26   Costello's work and Petitioner's home, not because they were meeting. See id. That does not

27   challenge the underlying cell phone evidence. Further, that argument was available to Petitioner

28   at the time of trial and nothing about the delayed disclosure impacted Petitioner's ability to make

1   such an argument. Similarly, Petitioner's inability to send or receive texts does not challenge the

2   testimony that Costello sent a text to Petitioner[2] and such an argument was available to Petitioner

3   regardless of the delayed disclosure.

4                Finally, the testimony about the length of the phone calls was, as summarized by

5   the Court of Appeal, that there were a "flurry of calls between the relevant phones over the next

6   several days including two calls between phones associated with defendant, Costello, and

7   Stewart, lasting more than 40 minutes altogether." ECF No. 10-32, pg. 23. Even if Petitioner only

8   spoke with Costello for five minutes, it is possible Costello and Stewart spoke for thirty-five

9   minutes, or longer.  Therefore, again, Petitioner does not challenge the accuracy of the cell phone

10  evidence.

11               This Court cannot find that the delayed disclosure about Detective Hitchcock's

12  past discipline for mishandling evidence prejudiced Petitioner because Petitioner conceded the

13  accuracy of the cell phone evidence when he presented an alternative narrative to explain such

14  evidence. The belated disclosure of this impeachment evidence is not sufficient to undermine

15  confidence in the verdict and therefore, there was no <u>Brady</u> violation. Thus, there is no basis for

16  federal habeas relief on Petitioner's <u>Brady</u> violation claim and Petitioner's claim should be

17  denied.

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  _____

28       [2]       I.e. Costello could have sent that text message and *because* Petitioner does not know how to text,
    Petitioner did not know about the text message.

1

2                                    **III.  CONCLUSION**

3              Based on the foregoing, the undersigned recommends that Petitioner's petition for

4    a writ of habeas corpus, ECF No. 1, be DENIED.

5              These findings and recommendations are submitted to the United States District

6    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

7    after being served with these findings and recommendations, any party may file written objections

8    with the court.  Responses to objections shall be filed within 14 days after service of objections.

9    Failure to file objections within the specified time may waive the right to appeal.  See Martinez v.

10   Ylst, 951 F.2d 1153 (9th Cir. 1991).

11

12   Dated:  March 26, 2025

13                                             _____
                                               DENNIS M. COTA
14                                             UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28